**Ernest Warren**
OSB #891384
Warren & Sugarman
838 SW First Avenue, Suite 200
Portland, Oregon 97204
503-228-6655
e.warren@ernestwarrenlaw.com

**Louren Oliveros**
OSB No. 155386
Oliveros Law, PLLC
50 Charles Lindbergh Blvd. Ste. 205
Uniondale, NY 1553
Telephone: (516) 310-4954
Email: oliveros@trialwarrior.net

*Of Attorneys for Plaintiff, Karen Chirre*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF OREGON**
**PORTLAND DIVISION**

| | |
|---|---|
| **KAREN CHIRRE,**<br><br>Plaintiff,<br><br>v.<br><br>CITY OF PORTLAND, CHARLES LOVELL, MICHAEL FROME, JOSEPH SANTOS, JENNIFER HERTZLER, SHAYE SAMORA, JACOB JENSEN, ROBERT QUICK, CHRIS LINDSEY, RACHEL BAER,<br><br>Defendants. | **CASE NO.: 3:24-CV-01334-AR**<br><br>**PLAINTIFF KAREN CHIRRE'S FOURTH AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

Plaintiff, Karen Chirre, demanding a jury trial, brings this action against Defendants City of Portland, Chief of Portland Police Bureau Charles Lovell, Deputy Chief Michael Frome, Detective Joseph Santos, Detective Jennifer Hertzler, Detective Shaye Samora, Commander Jacob Jensen, Lieutenant Robert Quick, Captain Chris Lindsey, and Detective Rachel Baer inclusive, for general, consequential, compensatory, punitive and statutory damages, costs, and

attorneys' fees resulting from Defendants' unconstitutional and tortious conduct, and as grounds therefore, allege as follows:

## JURISDICTION

1.

This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 and the Fourth and Fourteenth Amendments to the United States Constitution made applicable to Defendants through the Fourteenth Amendment to the United States Constitution. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331, 1343. The court has further jurisdiction over Plaintiff's state claim under 28 U.S.C. §1367 as this claim forms part of the same case and controversy under Article III of the United States Constitution.

## VENUE

2.

Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the entirety of the events or omissions giving rise to the claims herein occurred in Portland Oregon which is located in this Court's district.

## PARTIES

3.

Plaintiff, **Karen Chirre**, was at all relevant times to this complaint, a resident of Multnomah County which is located within the District of Oregon and otherwise subject to the jurisdiction of this Court.

4.


**WARREN & SUGARMAN**
838 SW First Avenue, Suite 200 | Portland, OR 97204 | (503) 228-6655

Defendant **City of Portland** is a legal entity established under the laws of the State of Oregon with all the powers specified and necessarily implied by the Constitution and laws of the State of Oregon. The Portland Police Bureau ("PPB"), as a constituent department of the City of Portland is a duly authorized and empowered governmental municipal entity that is subject to the jurisdiction of this Court. The City of Portland is a municipality located within the District of Oregon.

5.

At all relevant times, Defendant **Charles Lovell III**, a resident of the State of Oregon and employee of the City of Portland served as the Chief of Police for the Portland Police Bureau and is currently working for the Port of Portland Police. This defendant is being sued in his individual capacity.

6.

At all relevant times, Defendant **Michael Frome**, a resident of the State of Oregon and employee of the City of Portland served as the Deputy Chief of Police for the Portland Police Bureau. This defendant is being sued in his individual capacity.

7.

At all relevant times, Defendant **Joseph Santos**, a resident of the State of Oregon and employee of the City of Portland served as a Detective Sergeant for the Portland Police Bureau. This defendant is being sued in his individual capacity.

8.

At all relevant times, Defendant **Jennifer Hertzler**, a resident of the State of Oregon and employee of the City of Portland served as a Detective for the Portland Police Bureau. This defendant is being sued in her individual capacity.

9.

At all relevant times, Defendant **Shaye Samora**, a resident of the State of Oregon and employee of the City of Portland served as a Detective for the Portland Police Bureau. This defendant is being sued in her individual capacity.

10.

At all relevant times, Defendant **Jacob Jensen**, a resident of the State of Oregon and employee of the City of Portland served as a Commander for the Portland Police Bureau. This defendant is being sued in his individual capacity.

11.

At all relevant times, Defendant **Robert Quick**, a resident of the State of Oregon and employee of the City of Portland served as a Lieutenant for the Portland Police Bureau. This defendant is being sued in his individual capacity.

12.

At all relevant times, Defendant **Chris Lindsey**, a resident of the State of Oregon and employee of the City of Portland served as a Captain for the Portland Police Bureau. This defendant is being sued in his individual capacity.

13.

At all relevant times, Defendant **Rachel Baer**, a resident of the State of Oregon and employee of the City of Portland served as a Detective for the Portland Police Bureau. This defendant is being sued in her individual capacity.

**COMPLIANCE WITH THE OREGON TORT CLAIMS ACT**

14.

Plaintiff Karen Chirre served a timely Actual Notice on or about May 25, 2023 and Formal Notice of Claim upon the City of Portland by personal delivery on or about March 28, 2024 which was within 180 days of discovery of the final events giving rise to her claim. ORS 30.275(1), 2(B).

**STATEMENT OF FACTS**

15.

Having spent her childhood years in the City of Portland, Plaintiff, Karen Chirre ("Karen" "Plaintiff"), with a childhood aim of becoming a police officer looked at the prospect of enlisting in the U.S. military in order to gain both life experience and an education as means of accomplishing that long lasting goal. Thus, in 1989, Karen joined the United States Army. Despite enlisting during the unfolding of the Iraq war, Karen, with the aim of relying on her military enlistment as a steppingstone toward attaining her ultimate intention of becoming a police officer, opted to complete her service within a three-year period and thus foregoing higher rank and having to serve tours of duty in Iraq.

16.

As such, now armed with an honorable discharge and the G.I. bill, Karen enrolled at Mt. Hood Community College with a focus on criminal justice. Having now laid the foundation for


**WARREN & SUGARMAN**
838 SW First Avenue, Suite 200 | Portland, OR 97204 | (503) 228-6655

becoming a police officer, Karen undertook the application process for becoming and achieving her goal of joining the Portland Police Bureau (PPB).

17.

However, due to having a toddler as a single parent and the possibility of being assigned various shifts, Karen sought and obtained a police clerical assistant position with the Bureau which she commenced on or about 1994.

18.

In having diligently performed her duties and demonstrating a command for organization and logistics, Karen was promoted to the position of PPB Administrative Supervisor. As a management position, Karen was effectively charged with managing and running PPB's East Precinct by undertaking such responsibilities as hiring and training personnel, administrative tasks, logistics, computers, vehicles, facility and management. As a city employee whose position qualified as falling within the City of Portland's classified civil service, Karen's position, benefits, etc., were controlled by the City of Portland's regulations, protocols, etc., as enumerated in Chapter 4 of the City's charter and overseen by the City's Civil Service Board.

19.

Thus, in undertaking her role as PPB Administrative Supervisor, Karen met on multiple occasions with PPB command staff regarding precinct administration, resource allocation, and critical incident logistics. Despite her civilian status, Karen's leadership role firmly established her as PPB personnel essential to the day-to-day administration and emergency management readiness of the Bureau.

20.

Consistent throughout her PPB tenure, Karen's personnel record is devoid of disciplinary, corrective or adverse actions but rather on the contrary reflect her significant contributions to the implementation of managerial programs that has greatly enhanced the efficient functioning of the PPB. For example, Karen actively facilitated the advancement of workplace diversity; created more efficient systems and protocols for training, hiring, maintaining, and scheduling PPB staff and personnel as well as for the procurement, maintenance, and management of equipment, vehicles, IT and office needs; and in helping to manage PPB East Precinct's $22.8 million dollar budget for approximately 200 employees, sought innovative and efficient ways of optimizing the PPB's efficient functioning and evolution. Karen's contributions engendered acknowledgment and praise from the PPB's command over the twenty-eight-years of her tenure.

21.

Also, during Karen's PPB's tenure, in or about 2020, Karen married Bruce Chirre, a Peruvian national. In or about 2019-2020, Karen and her husband opened a convenience store in the ethnically diverse Goose Hollow section of Portland which, in its proximity to downtown Portland, attracted a large homeless population whose impact has resulted in high rates of theft, property crimes and other criminal activity. Lying in the heart of Goose Hollow, Karen and Bruce's Stadium Superette ("Superette") convenience store established itself as a hub in the community providing such additional services as free dinners, holiday gatherings, karaoke nights, and food distribution to their Goose Hollow community.

22.

Karen took pride in providing a bright light in a community that was economically challenged with a large low income and homeless population which looked to the Superette as a

place to procure necessities often resulting in theft from the store. In response, Karen contributed to providing free meals to the community for Thanksgiving and Christmas, with an aim of alleviating the need for theft and property crimes.

23.

Given the demographic, the PPB and the Portland Fire Department were often called to the Goose Hollow and surrounding neighborhoods. However, given the Bureau's liberal and permissive hands-off approach to the homeless population and their high rates of drug use and mental illness, the Bureau, and the Mayor's policies incurred much criticism as to their handling of the high rates of crime that was occurring throughout the City and particularly in the Goose Hollow neighborhood. See, https://www.city-journal.org/article/portland-sobers-up. The Bureau was similarly scrutinized in light of the "Defund the Police" and "Black Lives Matter" movements that arose in the aftermath of the George Floyd murder and fully embraced by the citizenry of Portland. The Bureau was under the watchful eyes of the public and additionally scrutinized given that it was under a 2014 Department of Justice consent decree requiring it to reform its policing protocols given the Bureau's unmitigated reliance upon excessive force as a means of policing in the City. See, https://www.portland.gov/police/doj.

24.

As such, Karen's two jobs, managing the PPB and running her convenience store in the Goose Hollow neighborhood were diametrically opposed where she had one foot within the community of law enforcement and the other conducting a business amongst the low income and homeless population which comprised the majority of the offenders that the PPB were called to control and arrest. See, https://www.youtube.com/watch?app=desktop&v=1UKG5il-KdQ.


**WARREN & SUGARMAN**
838 SW First Avenue, Suite 200 | Portland, OR 97204 | (503) 228-6655

25.

While Karen and her husband's convenience store was well acknowledged by PPB and its command, expressions of unfavorable and negative judgments and opinions were held and circulated throughout PPB, including by Defendants' Santos and Samora as to how and why Karen chose to work and associate with Goose Hollow's demographic. Such animosity and disparagement took the form of Defendants expressly discouraging would be customers from patronizing the Superette and derogatively designating the Superette as "Murder-Mart." As such, the underlying and simmering concern that one of PPB's Managing Supervisors was effectively servicing the highly criminalized downtown and Goose Hollow community came to a head on the early morning of April 5, 2021.

26.

On that morning, Karen and her husband were awakened by a phone call informing of an active arson fire set upon the Superette, their convenience store, as well as upon the adjacent properties of the Kingston Apartments and the OnPoint Credit Union. The arsonist, later to be identified as Jack Dekker, was a serial arsonist who on that evening was acting out while experiencing an acute drug crisis. Portland Fire and Rescue, as well as PPB were well aware of Dekker and his history of lighting fires in the Goose Hollow neighborhood.

27.

While this was not the first instance of fires being set in the Goose Hollow neighborhood, including on the Stadium Superette, Karen and her husband, who were coincidentally spending the evening in their living quarters housed inside the Superette readied themselves to rush outside to secure the safety of their business.

28.


WARREN & SUGARMAN
838 SW First Avenue, Suite 200 | Portland, OR 97204 | (503) 228-6655

Karen's husband was the first to rush outside while Karen took more time to dress and followed thereafter.

29.

Upon exiting the Superette, Karen responded to the fire set within a garbage bin situated in front of the Superette and thereafter, tackled a fire in an adjacent building as well as another set across the street in a shopping cart. During this time of actively putting out fires, Karen had not seen her husband nor knew where he had gone but assumed that he too was assisting in putting out the several fires that Jack Dekker had set in the adjacent area. It was only when she reconvened with her husband upon his return to the Superette did she notice that he had a severely swollen hand and what appeared to be burns on his leg.

30.

Although Karen pressed her husband as to his whereabouts, he refrained from engaging and implored them to go to sleep and revisit the harrowing events of the evening in the morning.

31.

Upon awakening in the morning, the events of the prior evening flooded back into focus. In checking in with the PPB as she did every morning, Karen learned that the PPB had set up operations across the street from the Superette. Meanwhile, Karen's husband went outside to clean up the charred garbage bin that was in front of the Superette while Karen showered and prepared for her day.

32.

Sometime thereafter, Defendant PPB Detective Hertzler and Detective Beniga approached Karen and her husband and in assuming an interrogational posture and separated Karen from her husband. Detective Samora escorted Karen to an awaiting PPB patrol car and


**WARREN & SUGARMAN**
838 SW First Avenue, Suite 200 | Portland, OR 97204 | (503) 228-6655

drove to a parking lot across from the Superette where she was then escorted into the back seat of another PPB unmarked vehicle where Detective Corona was waiting and sitting in the driver's seat.

33.

As Detectives Samora and Corona were Karen's PPB colleagues and without the slightest consideration that she was being interrogated, not as a witness to the arson attacks but rather as a potential suspect, Karen willingly entered the unmarked vehicle to respond to the Detective's queries who unprovokedly encouraged her to "just tell the truth."

34.

Regardless of how Karen understood the Detectives' rationale for questioning her, the Detectives refrained from informing Karen that she was not being detained and was thus, free to refrain from engaging in further conversation with the Detectives.

35.

Nevertheless, Karen narrated a truthful account of the events that transpired the evening before including that she had not observed her husband at any time when she was extinguishing fires close to the Superette and at adjacent neighbor's properties.

36.

It was only upon her husband's return inside the Superette that she reconvened with her husband whom she noticed had a swollen hand and burns on his leg. In refusing to chat, Karen and her husband immediately proceeded to bed in utter exhaustion given the late hour and the adrenalin inducing events of extinguishing fires.

37.


**WARREN & SUGARMAN**
838 SW First Avenue, Suite 200 | Portland, OR 97204 | (503) 228-6655

Nevertheless, despite communicating that she had lost sight of her husband during the time she was extinguishing the fires, Defendant Detective Samora and Detective Corona persisted in their aggressive attempt to force Karen to disclose what the Detectives assumed she knew about her husband's whereabouts and his actions the night before.

38.

Karen reaffirmed that she had no information to provide and that she was telling the truth. Given the Detectives' aggressive and threatening tone, it became crystal clear that her husband was being suspected of having murdered the arsonist, Jack Dekker and that she was being compelled to substantiate that allegation.[1]

39.

On the same morning, Defendant Detectives obtained a search warrant and upon effectuating a search of the Superette, confiscated among other items such as, Karen's PPB employment identification, cell phones, computers, clothing, and other items that Defendant Detectives were hopeful would substantiate their suspicions.

40.

[1] The press reported the incident on April 5, 2021 as well as several arsons in the Goose Hollow neighborhood which underscored and reflected negatively on the Bureau's ability to provide a semblance of safety in light of the overabundance of homelessness on the streets of Goose Hollow and throughout the City of Portland. https://www.portlandtribune.com/news/police-dead-body-found-near-portlands-providence-park/article_cc7b09f0-0ab3-5d6f-b063-b97a769add13.html; https://ktvl.com/news/police-conduct-death-investigation-near-providence-park; https://www.portlandoregon.gov/police/news/read.cfm?id=301620.


WARREN & SUGARMAN
838 SW First Avenue, Suite 200 | Portland, OR 97204 | (503) 228-6655

Separated from her husband, Karen had come to learn that her husband had been transported to the PPB's Detective Division at the Bureau's Southwest Second Avenue location. With the intention of ensuring that her husband was okay and that the burns that he incurred the previous evening were being attended to, Karen quickly went to the PPB's Central Precinct to check on her husband.

41.

Recognizing that Karen was the PPB's Administrative Supervisor at East Precinct, the Central Precinct's front desk clerk provided Karen, as she did with all PPB personnel without identification, with a visitor badge and waived her through where she proceeded to the Detective Division on the thirteenth floor with an intention of speaking with a Detective or Sergeant to determine her husband's physical welfare.

42.

Upon arriving at the thirteenth floor, the receptionist, on her own accord, again waived her through into the Detective Division's office area. Given her overwhelming and adrenalin informed concern for her husband, Karen, in realizing that she had best follow official protocol and wait to speak with Detective Sergeant Santos or another Detective in the reception area, returned to the Detective Division's lobby.

43.

After some time, Defendant Detective Sergeant Santos arrived and immediately assumed an accusatory tone berating Karen that she should stop lying and come clean with what she knew about her husband's actions the previous evening.

44.


**WARREN & SUGARMAN**
838 SW First Avenue, Suite 200 | Portland, OR 97204 | (503) 228-6655

In reiterating that she had been consistently truthful with what she knew, Detective Sergeant Santos threatened that if Karen persisted in withholding what she knew that her employment with the PPB would be terminated and that she would be criminally charged.

45.

Enraged, Detective Sergeant Santos escorted Karen out of the Detective Division as well as the Precinct itself with a directive that she not return. Such treatment was exasperating given that Karen had been forthright with the Detectives as to what she knew and that there was nothing to substantiate the Detective's accusations that she was lying or withholding information.

46.

The threat that she would be fired from her civil service position which she held for twenty-eight-years was equally mortifying and perplexing. It became distressingly clear to Karen that the Detective unit had predetermined, without reasonable suspicion, let alone probable cause, that Karen was somehow covering up for her husband's purported criminal conduct.

47.

Despite the Detectives' conjecture unsupported by any unfounded speculation that Karen was covering up for her husband and/or had committed any crimes, on the following day, April 6, 2021, East Precinct Commander Erica Hurley placed Karen on paid administrative leave and issued an internal affairs complaint.

48.


**WARREN & SUGARMAN**
838 SW First Avenue, Suite 200 | Portland, OR 97204 | (503) 228-6655

Thus, Karen was relieved of her Administrative Supervisor position which she held for twenty-eight years based on nothing more than unsupported conjecture and assumptions. Given the irrational manner in which she had been treated by both Defendant Detectives and Command, Karen could only conceive that some other consideration was at play that could reasonably account for her treatment.

49.

Thus, over a period of approximately one year and eleven months, Karen remained on paid administrative leave and was thus separated from the job she loved as PPB East Precinct's Administrative Supervisor.

50.

After silence throughout this long stretch of time, on or about March 17, 2023, Karen was informed that she had been indicted on three counts of Hindering Prosecution, one count of Tampering with Evidence and one count of Official Misconduct. Upon information and belief, the evidence that Defendant Detectives Santos, Samora, Hertzler, and Lieutenant Quick presented to the District Attorney's Office as substantiating probable cause for the charge of Official Misconduct was fabricated and fallacious, while the three Detectives Santos, Samora, and Hertzler withheld disclosure of the exculpatory laboratory evidence which wholly exculpated Karen's guilt pertaining to the Tampering with Evidence and Hindering Prosecution charges.

51.

Upon learning of the arrest warrant from Defendant Hertzler on March 17, 2023, Karen duly complied by promptly appearing at the Central Precinct to turn herself in. Having done so, Karen's liberty was constrained as she was forced to spend a substantial number of hours in jail.

 **WARREN & SUGARMAN**
838 SW First Avenue, Suite 200 | Portland, OR 97204 | (503) 228-6655

52.

Perhaps not coincidentally, on the same day, March 17, 2023, when Karen and Bruce were being processed for their arrest on charges stemming from the incident on April 5, 2021, and thus, not present at their properties, PPB's SERT unit executed a search on Karen's properties, including the Superette, her home and her vehicles. The search resulted in the confiscation of Karen's electronic devices, wallets, keys, and identifications. Upon information and belief and in further retaliation in violation of Karen's Fourth Amendment rights, Defendant Detective Rachel Baer procured a search warrant that relied upon patently unfounded and false information with the aim of further ensuring Karen's arrest and thereby ultimate expulsion from the Bureau.

53.

The March 17, 2023 search was purportedly in response to a January 2023 armed robbery at the Superette where a customer and friend of the homeless perpetrator contacted the police after the incident and reported that Karen's husband had and/or brandished a firearm. Upon information and belief, the intention underlying the March 2023 search warrant was in fact a fishing expedition related to the criminal charges stemming from the April 5, 2021 incident.

Such inference is patently reasonable given Defendant Baer's requested warrant's overly broad seizure list that included categories such as DNA and other biological materials, cleaning kits and electronic memory devices. Given the allegations supporting the purported criminal charge, i.e., Robbery and Brandishing a Firearm, such requests for "DNA and other biological materials, cleaning kits and electronic memory devices" are reasonably far afield from the crimes being investigated but most pointedly correlated with the charges that Karen was poised to be indicted on, to wit: Official Misconduct, Hindering Prosecution, and Tampering with Evidence.

54.

Thus, Defendant Baer intentionally used a broadly worded search warrant issued for one criminal investigation as a pretext to conduct an investigative search for evidence relating to a separate, unrelated criminal charge whose fruits were ultimately relied upon in obtaining the above three indictable offenses pertaining to the April 5, 2021 Goose Hollow arson incident.

55.

Three days thereafter, on or about March 20, 2023, Karen was arraigned on her indictment at the Multnomah County Circuit courthouse where she was granted pre-trial release on the condition that she called in to the pre-trial release personnel every Tuesday pending trial.

56.

On or about the same day and in response to Karen's indictment and arrest, Chief of Police Lovell publicly and irreparably impugned Karen's reputation and standing in the community by doubling down on the heretofore unjustified indictment by proclaiming "Police personnel are held to a higher standard. Any time it is alleged that a member of the Police Bureau has acted improperly, we owe it to our community to conduct a complete and thorough investigation. I want to thank the hard work of officers, detectives, criminalists and other Bureau members for their work investigating this case." Oregon Public Broadcasting March 18, 2023 https://www.opb.org/article/2023/03/18/portland-oregon-police-administrative-employee-charged-in-relation-to-2021-killing. Chief Lovell's statement was disseminated throughout the media infosphere where Karen's integrity was tarnished with dishonesty, fraud, and criminal conduct which all but decimated her professional reputation, forever foreclosing future public employment. See, https://portlandtribune.com/2023/03/18/portland-police-employee-husband-charged-in-2021-murder/("Karen Chirre is an administrative supervisor assigned to East Precinct. She has worked for the police bureau for 28 years and has been on administrative leave

since April 2021 during a pending internal investigation"); https://katu.com/news/local/man-indicted-for-2021-homicide-in-nw-portland-his-wife-a-police-employee-also-arrested ("Court records say shortly after the killing, both Chirre's took action to "destroy, mutilate, alter, conceal and remove physical evidence" that could have led to a prosecution.") Chief Lovell's communicated certainty that PPB's investigation indisputably supported the indictable charges levied against Karen directly contradicted his prior knowledge that the laboratory results sought to substantiate Karen's tampering charge had in fact produced an exculpatory result thereby negating that charge.

57.

PPB's investigation of Karen and subsequent arrest transpired despite the well-established custom and practice of deferring investigation to an 'impartial' law enforcement agency in order dispel any inference or appearance of conflict of interest where the investigation involves PPB law enforcement personnel who are alleged to have engaged in conduct that could lead to criminal prosecution.

58.

Here, given Karen's twenty-eight-year tenure with the PPB, due process required that PPB step aside and recuse itself from undertaking Karen's criminal investigation. Such approach was particularly required given the high-profile critique that PPB and Chief Lovell were publicly incurring and on account thereof, the strong risk that Karen's impartial investigation would be sacrificed in order to place PPB in a positive light by showing that it was fighting to address internal corruption and self dealing. Thus, it was too politically expedient for the PPB to sustain the allegations against Karen such that transferring the investigation to an impartial police department was absolutely required to dispel any inference of a conflicted, predetermined PPB investigation. Such protocol was in fact provided for by Portland Police Bureau (PPB) policy

Directive 0333.00 which provides that "for alleged criminal actions by Bureau members occurring within the city of Portland, the Chief or designee may request an outside law enforcement or prosecutorial agency to conduct the criminal investigation concurrent with the administrative investigation conducted by PPB." https://www.portland.gov/policies/police-directives/conduct-discipline-0300/033300-criminal-investigations-police-bureau

59.

Equally and more dispositively troubling was the fact that on or about May 12, 2021, May 27, 2021, and February 24, 2022, before Karen's indictment was issued, the results from DNA laboratory analysis' conducted to determine whether Karen had tampered with evidence came back negative which was a result that wholly negated any determination of the existence of probable cause for tampering with evidence.

60.

While the laboratory reports reflected DNA from both Karen's husband and the deceased, there was no evidence that the items containing the DNA had been tampered with either through the application of soap, solvent, or bleach which was a hypothesis that the Defendants Hertzler, Santos, and Samora had otherwise relied upon in premising probable cause to support the criminal charges of Tampering with Evidence and Hindering Prosecution. Said exonerating lab results, dated May 12, 2021, May 27, 2021 and February 24, 2022 were received at a temporally proximate time by Chief Lovell and Deputy Chief Frome as is otherwise mandated by PPB Directives. As lead Detectives, Detectives Samora and Hertzler also received the results which they suppressed and withheld from the District Attorney's office.

61.

Such negative results were significant enough to eviscerate any finding or inference of probable cause such that it reasonably warranted PPB to cease pursuing the tampering and hindering charges against Karen. Given the high profile nature of the charges against Karen, as a PPB employee and the reflection that misconduct charges would have on the already beleaguered Bureau where accusations of corruption and impunity were rampant,[2] upon information and belief, Chief Lovell, as the Bureau's final policymaker and spokesman for the PPB was very much apprised of the progress of Karen's investigation such that he was aware and apprised of the shortcomings of the investigation, including the exculpatory laboratory results that otherwise eviscerated the charges of Tampering with Evidence and Hindering Prosecution[3].

62.

With respect to the Official Misconduct charge, probable cause was similarly absent where Defendants Santos, Hertzler, and Quick were well aware that Karen had accessed the Detective Division's thirteenth floor office by officially obtaining a visitor's badge and not, as alleged, by using her PPB credentials or under the guise that she was exercising her employment duties to bypass the official channels of gaining access to the restricted and appointment-only thirteenth floor.[4]

---

[2] See, https://www.wweek.com/news/2023/08/08/in-an-unusual-email-police-chief-chuck-lovell-told-his-troops-to-stop-badmouthing-da-mike-schmidt-and-the-city-of-portland/ https://www.opb.org/article/2023/09/20/portland-police-chief-chuck-lovell-resignation/

[3] Pursuant to PPB Directive 0333.00 (§4.1 & 4.2.1) mandates that the Chief of Police must be notified at the onset, as well as the progress of any criminal or administrative investigation involving a Bureau employee.

[4] As Karen's administrative colleague at PPB's East Precinct, Defendant Lieutenant Quick was informed that Karen was heading over to check on her husband's welfare at the Bureau's Southwest Second Avenue location. Despite knowing the truthful nature of Karen's intention, Defendant Lieutenant Quick informed Defendant Santos that Karen was on her way to unlawfully intercede into Det. Santos' investigation thereby intending to violate Or. Revised Statues and PPB regulations. Despite the fact that Karen conducted herself within PPB regulations while at the precinct on April 5, 2021, Defendant Lieutenant Quick and investigating

63.

Defendant Santos was similarly well apprised that Karen accessed the Detective Division to speak with the Detectives, including Detective Sergeant Santos and to inquire as to the well-being of her husband rather than with purposes to interfere with and obstruct her husband's investigation.

64.

Nevertheless, Defendants Santos and Hertzler persisted with their investigation of Karen's conduct by concocting and fabricating tenuous evidence. For example, despite absolutely no corroborating evidence, Defendant Santos fabricated testimony that Karen had in fact been aware of her husband's whereabouts on the evening of April 5, 2021, and purportedly witnessed her husband utilize a fire extinguisher as a weapon whose strike to Jack Dekker's head contributed to Dekker's death.

65.

Laboratory testing performed on the fire extinguisher on or about August 23, 2021, and September 7, 2021, as well the ME's report dated April 6, 2021, dispelled this fabricated theory prior to Karen's March 16, 2023 indictment which again, should have negated any finding of probable cause and thereby nullifying its chargeability.

66.

Similarly, Defendants Santos and Hertzler fabricated events to support the Official Misconduct claim stating that on that morning of April 5, 2021, when Karen went to the Central

---

Detectives Santos, Samora, and Hertzler fabricated the facts and circumstances of Karen's precinct visit such that the fabrications, as articulated in their respective police and investigative reports, were produced to the District Attorney's office who relied upon the assertions therein to adduce probable cause (and indictments thereupon) as grounds for supporting Karen's arrest.

Precinct to check on her husband, she had aggressively pressured the front desk clerk of the Detective Division to allow her to speak with the assigned Detective.

67.

Nevertheless, on or about March 21, 2023, the day after arraignment, Defendant Deputy Chief Frome moved to revoke Karen's CJIS security clearance as opposed to the well-established practice of suspending such clearance until after determination of the final disposition of the law enforcement personnel's criminal charges.

68.

On the following day, March 22, 2023, Karen was informed that she was now placed on unpaid administrative leave and additionally subject to a PPB Internal Affairs investigation.

69.

In response to the impact of having to face such outright and undeserving rebuke and reproach from the PPB after having devoted twenty-eight years of service to its cause while additionally having to defend against evidentiary insufficient criminal charges against her and her husband and the SERT search warrant being conducted, Karen sought refuge in thoughts of taking her own life.

70.

In reaching out for help, Karen had been receiving ongoing therapeutic assistance from Kaiser Permanente to assist in coping with the emotional damages that Defendants deplorable conduct had engendered.

71.

In furtherance of publicly distancing themselves from Karen and her employ with PPB, Defendant Chief Lovell as final policymaker and Defendant Deputy Chief Frome with respect to

PPB personnel matters, see City of Portland Charter § 2-406, determined and ratified Karen's termination that was then communicated to Karen, on or about May 10, 2023.

72.

Karen was informed that her twenty-eight-year unblemished tenure with the PPB was being terminated on the non-disciplinary ground that her ability to undertake her position as Administrative Supervisor would be significantly curtailed on account of having had her CJIS security clearance revoked.

73.

Such terminal decision however was transparently pretextual as both her security clearance and her employment position could have been suspended rather than terminated as had been PPB's practice on previous occasions where other PPB personnel had similarly faced criminal prosecution during their employment. Thus, upon acquittal of the criminal charges levied against her, Karen's perceived threat of retaining a security clearance during the pendency of a criminal prosecution would have dissipated thereby allowing Karen to continue performing the multiplicity of tasks in the consistently proficient manner that she had done over her unblemished twenty-eight-year tenure with the PPB.

74.

Nevertheless, the decision to terminate Karen's employment was rendered despite the existence of a determinative conviction which would have dispositively and permanently precluded Karen's ability to reestablish issuance of a security clearance. Thus, Chief Lovell and Deputy Chief Frome's decision to formally terminate Karen's twenty-eight-year PPB tenure was rendered for reasons other than an absence of a security clearance. Rather, termination was rendered as retaliation for Karen's perceived and acknowledged right of association such that Chief Lovell and Deputy Chief Frome chose to intentionally sacrifice Karen's unblemished

service as a means of placing PPB in a more positive public light, i.e., a public affirmation that the PPB was cleaning up its act by no longer concealing and condoning internal corruption which the Bureau had been previously accused of.

75.

Thus, despite Karen's sterling and unblemished employment record over her twenty-eight-year tenure with PPB, Defendants decision to terminate Karen's employment on pretextual grounds (rather than await final disposition of her criminal prosecution), glaringly reflected that Karen's arrest shined too bright of light on the already embattled PPB whose decision to prosecute one of its own communicated to the Mayor's office, Portland City Council, the Community and the Defund the Police movement that it had changed its course by dispelling any inferences of internal Bureau corruption and self-dealing.[5] Such decision to swiftly move Karen outside its ranks was equally informed by Karen's ownership of her Goose Hollow Superette which conspicuously served Portland's low income and homeless community such that this fact further placed Karen's public image in a negative light and one that the PPB felt pressured to distance itself from. Thus, despite having viable options other than outright termination, Chief Lovell made this determination based upon Karen's perceived association and speech.

[5] On or about March 24, 2021, Chief Lovell held a press conference where he addressed public concerns of severe distrust with the PPB where the Bureau was riddled with allegations of internal irregularities, coverup, and member descension which Chief Lovell described as "self inflicted injuries." Chief Lovell underscored, "I talk to them all the time about trust and how the things that we do, even allegations of things or just questions about how things transpire, those have an impact on how the public views us and if we want to gain and build on public trust, we have to be doing things in a way that the public can trust in." https://katu.com/news/local/portland-police-chief-chuck-lovell-set-to-speak-to-media-wednesday.

76.

Thus, PPB effectively threw Karen 'under the bus' for both her association with the Goose Hollow neighborhood as well as to garner public favor in order to counteract what had been an ongoing campaign of incurring public derision and censure.

77.

With an unmistaken intention to inflict further harm on Karen, as well as exposing Defendants' clear intention that they had determined to terminate her employment immediately upon Karen's arrest and arraignment, Defendants revoked Karen's medical insurance on May 11. 2023 but failed to inform Karen that said insurance had lapsed as of March 31, 2023.

78.

Such lapse detrimentally impeded her from obtaining the necessary therapeutic treatment that she had been relying upon in order to cope with Defendants intentional conduct in turning her world upside down.

79.

In moving forward with termination and attempting to comply with the City of Portland's civil services protocols for terminating employment of classified employees like Karen, Chief Lovell through Defendant Deputy Chief Frome scheduled a termination hearing on or about July 10, 2023.

80.

Despite being required to comply with City of Portland Human Resources Administrative Rule (HRAR) 5.01 by providing a seven-day notice of the City's proposed disciplinary action, Defendant City failed to provide such notice, let alone within the time constraints of HRAR 5.01.

81.


**WARREN & SUGARMAN**
838 SW First Avenue, Suite 200 | Portland, OR 97204 | (503) 228-6655

Although Karen was accompanied by counsel to the separation hearing, Karen was precluded a meaningful opportunity to be heard as required under her state and federal rights to due process.

82.

For example, at the hearing, Portland's City Attorney Lisa Rogers, City of Portland HRBP's Kristina Porreco, Angela Tran, and Deputy Chief Michael Frome solely informed Karen that on account of the revocation of her CJIS security clearance Karen was no longer able to carry out her function as an Administrative Supervisor and as such, non-disciplinary separation was the only option.

83.

Such conclusion was patently false as redeployment, demotion, and or continuation of administrative leave pending final disposition of the criminal prosecution were well established, prescribed alternatives under HRAR 3.15 and HRAR 5.01.

84.

Given that termination of Karen's position and employment after twenty-eight years was the matter at hand, the quantum of process provided was exceedingly negligible and thereby fell below that which was required to satisfy due process under both state and federal law. In particular, the process reflected that a predetermined result had been decided upon where Deputy Chief Frome opened the hearing by asserting that termination was the only viable result given the absence of Karen's security clearance. Deputy Chief Frome and other City of Portland representatives dismissed without consideration alternatives to termination as otherwise provided by HRAR 5.01 (redeployment, demotion, or continued leave pending trial). The hearing body refused to entertain the Oregon State Police's explicit written recommendation that Karen's


**WARREN & SUGARMAN**
838 SW First Avenue, Suite 200 | Portland, OR 97204 | (503) 228-6655

security clearance would be immediately reinstated upon being exonerated of the pending criminal charges. Similarly, with an intention to circumvent civil service protections and the requirements of Directive 0333.00/0330.00, Deputy Chief Frome and the hearing officers issued a ‘non-disciplinary’ termination. Thus, while a hearing was held, a predetermined outcome precluded Karen of the due process she was otherwise entitled to where termination of her twenty-eight-year civil service position was at stake.

85.

Having received formal notice of her separation the following day, July 11, 2023, Karen proceeded to assert her innocence by mounting a colorable defense before the Circuit court.

86.

During a judicial settlement conference on December 13, 2023, before the Circuit Court on the criminal matter, the Court, upon reviewing the complete case file, expressed serious reservations regarding the legal validity of the criminal charges sought against Karen.

87.

After a second settlement conference where Karen agreed to and thereafter sufficiently satisfied a polygraph test, the Circuit Court, on March 12, 2024, prior to the start of trial, accepted the District Attorney’s offer to drop two charges of Hindering Prosecution.

88.

Thereafter, on or about March 15, 2024, the Circuit Court dismissed the remaining Hindering Prosecution charge as well as the sole Tampering with Evidence charge. Five days later, on or about March 20, 2024, upon completing the trial on the remaining one count of Official Misconduct, the Circuit Court acquitted Karen thereby placing an end to PPB’s attempt to substantiate charges that relied upon the fabrications and withholdings of Defendant

Detectives Santos, Samora, Hertzler and Lieutenant Quick. At the end of the trial, Defendants Hertzler and Samora along with other PPB personnel who were in attendance palpably displayed disappointment with Karen's acquittal by demonstrably storming out of the courtroom.

89.

Following her complete exoneration of criminality before the Circuit Court, Karen similarly sought exoneration before the Oregon Government Ethics Commission (OGEC) which initiated an ethical investigation (Case No. 23-129EHM) on account of the criminal charges filed against her as well as public comments issued by Chief Lovell and PPB. On or about June 28, 2024, the OGEC issued a formal Final Order of Dismissal that completely exonerated Karen of any State ethics violations.

90.

Despite having been completely exonerated from all criminal charges, the now Chief Robert Day, as the final arbiter of PPB employee rights failed to provide Karen with a post-deprivation name-clearing hearing given that the otherwise dismissed criminal charges which, upon public dissemination by Chief Lovell while pending, served to seriously impugn Karen's honesty, integrity and professional reputation and were the sole grounds for terminating her twenty-eight-year PPB employment.

91.

As a further expression of malice directed at Karen, on or about July 31, 2024 and approximately one year after formally terminating Karen's employment on July 11, 2023, and four months after her complete exoneration of criminal charges on March 20, 2024, and one month after the OGEC issued its Final Order of Dismissal June 28, 2024 clearing her of any State ethics violations, Defendants Captain Chris Lindsey and Commander Jacob Jensen sustained the PPB Internal Affairs disciplinary charges filed against Karen. The temporality of

the IA finding was patently insufficient as said investigation and finding was required to be completed prior to or concurrently with any administrative discipline ensuring that an active public employee receives meaningful notice and opportunity to refute findings during active employment. PPB Directives 0333.00, 0330.00 and 0332.00. Here, the IA finding was announced approximately one year after Karen's termination on or about July 11, 2023.

Specifically, Lindsey and Jensen sustained the otherwise meritless and vexatious charges of (1) misusing PPB's equipment by accessing an investigation data base for information regarding her husband; (2) providing untruthful statements to homicide Detective Samora; (3) deceptively utilizing her PPB employment to gain access to restricted areas in the Central Precinct; and (4) failing to inform PPB supervisor of her March 15, 2023 indictment[6]. Upon information and belief, both Lindsey and Jensen were well informed by Detectives Sergeant Santos and DetectivesSamora and Hertzler, as well as from the associative reports, records and trial testimony and record that Karen had not "deceptively utilized her PPB employment to gain access to restricted areas in the Central Precinct."[7]

92.

As was the case with Karen's arrest and indictment, the sustained disciplinary findings were categorically reliant upon fabricated and intentionally disregarded exculpatory evidence. Thus, despite having been wholly exonerated of the criminal charges brought against her which would have otherwise permitted Karen to reclaim her employment given her non-disciplinary termination, Defendant Lovell, as final decisionmaker with respect to PPB personnel, and Defendants Lindsey and Jensen, as IA investigators saw fit to prevent such result from occurring

[6] Karen's indictment was in fact on March 16, 2023 and she was not notified until March 17, 2023.

[7] PPB Directive 0333. 6.1.3. "All information developed in the criminal investigation shall be forwarded to IA."


**WARREN & SUGARMAN**
838 SW First Avenue, Suite 200 | Portland, OR 97204 | (503) 228-6655

by perpetuating and sustaining disciplinary charges that thereafter created the administrative grounds for permanently precluding Karen from working at PPB or other law enforcement agencies ever again.

**FIRST CAUSE OF ACTION**

**(42 U.S.C. §1983 MALICIOUS PROSECUTION)**
**(Against Defendants Lovell, Quick, Santos, Hertzler, Samora in their Individual capacities)**

Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

93.

In committing the acts and omissions complained of herein, Defendants Lovell, Quick, Santos, Hertzler, and Samora acted under color of state law to deprive Plaintiff of constitutionally protected rights under the Fourth Amendments to the United States Constitution.

94.

Defendants Lovell, Quick, Santos, Hertzler, and Samora acted with malice and caused the initiation of false and unfounded charges to be filed against the Plaintiff subjecting her to malicious prosecution which deprived her of her right to be free from unreasonable seizure of her person under the Fourth Amendment of the United States Constitution.

95.

Upon her arrest lacking probable cause, Plaintiff's liberty was restrained by being forced to spend a number of hours in jail.

96.

Defendants Lovell, Quick, Santos, Hertzler, and Samora were actively involved in causing Plaintiff to be prosecuted for the charges of ORS 162.295 (Tampering with Evidence); ORS 162.325 (Hindering Prosecution) and ORS 162.415 (Official Misconduct) by undertaking a partial and slanted investigation, fabricating material evidence relied upon by the District Attorney's office, withholding exculpatory evidence, and conjuring and perpetuating false narratives with respect to Plaintiff's intended presence of checking on her husband at the Detective Division on or about April 5, 2021.

97.

The criminal proceedings charging these criminal statutes were resolved in Plaintiff's favor when four out of the five counts were dismissed and the fifth resulting in acquittal.

98.

No reasonable person in the same position as Defendants Lovell, Quick, Santos, Hertzler, and Samora would have believed that based upon the evidence before them there was reasonable grounds for finding probable cause and upon such, causing Plaintiff to be arrested and prosecuted on the forementioned criminal statutes because the Defendants had knowledge that Plaintiff did not commit any crime on or about the early morning of April 5, 2021 and thereafter upon visiting the precinct.

99.

Defendants Lovell, Quick, Santos, Hertzler, and Samora acted primarily for a purpose other than to bring Plaintiff to justice given their knowledge that Plaintiff had not committed the criminal offenses that Defendants had falsely alleged nor did they have probable cause to believe that Plaintiff had committed said offenses.

100.

As a direct and proximate result of the foregoing wrongful malicious prosecution, Defendants Lovell, Quick, Santos, Hertzler, and Samora**,** and each of them, have caused injuries to Plaintiff's health, strength and activity, along with residual economic and social harms and damages including but not limited to lost wages, lost benefits, loss of future earnings and benefits, medical expenses, mental anguish, distress, humiliation, anxiety, pain and suffering, loss to reputation, embarrassment, and fear, such that the injuries incurred on account of Defendants' conduct have caused and continue to cause Plaintiff great mental, physical and nervous pain and suffering, humiliation, shock, distress and anguish.

101.

As such actions were undertaken in conscious and reckless disregard of the risk of injury to Plaintiff and done without any objective reasonable basis, Defendants' conduct can only be construed as intending to cause Plaintiff injury and as such, were performed in a malicious, and/or oppressive manner entitling Plaintiff to recover punitive damages from Defendants in an amount to be calculated according to proof.

## SECOND CAUSE OF ACTION
**(42 U.S.C. §1983 FOURTH AMENDMENT-Unreasonable Search & Seizure)**
**(Against Defendant Baer in her Individual Capacity)**

Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

102.

At all relevant times, Defendant Baer was acting under color of state law and within the course and scope of her employment as law enforcement officer of Defendant, City of Portland.

103.

Defendant Baer initiated, procured, obtained, and/or caused the issuance of a search warrant ostensibly for the purpose of investigating allegations concerning a February 2023 armed robbery at Plaintiff's Superette where a customer and friend of the homeless perpetrator contacted the police after the incident and reported that Plaintiff's husband had and/or brandished a firearm.

104.

Defendant Baer knew, or reasonably should have known, that the actual purpose of obtaining and executing the warrant was materially different from the actual investigative purpose for which the warrant was sought and employed.

105.

Specifically, Defendant Baer utilized the purported investigation identified in the warrant application as a pretext and subterfuge to obtain judicial authorization to search Plaintiff's person, residence, premises, property, and/or belongings for evidence relating to separate and unrelated criminal allegations involving the same parties; to wit, the April 5, 2021 arson and its aftermath where allegations stemming from such event formed the charges of Official Misconduct, Hindering Prosecution and Tampering of Evidence levied against Plaintiff.

106.


**WARREN & SUGARMAN**
838 SW First Avenue, Suite 200 | Portland, OR 97204 | (503) 228-6655

The unrelated criminal allegations were not the stated investigative basis for the warrant and were not the legitimate purpose for which the warrant was presented to the issuing judicial officer.

107.

Defendant Baer used the warrant as an investigative vehicle to pursue matters beyond the legitimate scope and purpose of the judicial authorization obtained, thereby transforming an ostensibly authorized search into an unreasonable search and seizure prohibited by the Fourth Amendment.

108.

Defendant Baer’s conduct was not an inadvertent or incidental expansion of an otherwise legitimate investigation. Rather, Defendant Baer knowingly exploited the judicial warrant process to accomplish an investigative objective materially different from the one represented in the warrant application.

109.

In executing the warrant, Defendant Baer searched, examined, seized, collected, photographed, reviewed, and/or retained property, documents, records, electronic information, and other materials for the purpose of investigating the unrelated criminal allegations pertaining to the April 5, 2021 arson.

110.


**WARREN & SUGARMAN**
838 SW First Avenue, Suite 200 | Portland, OR 97204 | (503) 228-6655

To the extent Defendant Baer searched for or seized items outside the categories authorized by the warrant, or searched areas and information unsupported by the warrant's particularity and probable-cause limitations, such conduct exceeded the permissible scope of the warrant and constituted an unreasonable search and seizure.

111.

Defendant Baer's conduct deprived Plaintiff of the right to be free from unreasonable searches and seizures guaranteed by the Fourth Amendment to the United States Constitution.

112.

The conduct of the Defendant was intentional, deliberate, and undertaken with knowledge of the actual investigative objective, or with reckless disregard for Plaintiff's clearly established constitutional rights.

113.

That as a direct and proximate result of the foregoing wrongful and unreasonable search and seizure in violation of the Fourth Amendment, Defendant Baer has caused injuries to Plaintiff's health, strength and activity, along with residual economic and social harms and damages including but not limited to lost wages, lost benefits, loss of future earnings and benefits, medical expenses, mental anguish, distress, humiliation, anxiety, pain and suffering, loss to reputation, embarrassment, and fear, such that the injuries incurred on account of Defendant Baer's conduct have caused and continue to cause Plaintiff great mental, physical and nervous pain and suffering, humiliation, shock, distress and anguish.

114.

As such actions were undertaken in conscious and reckless disregard of the risk of injury to Plaintiff and done without any objective reasonable basis, Defendant Baer's conduct can only

be construed as intending to cause Plaintiff injury and as such, were performed in a malicious, and/or oppressive manner entitling Plaintiff to recover punitive damages from Defendant Baer in an amount to be calculated according to proof.

**THIRD CAUSE OF ACTION**

**(42 U.S.C. §1983 FOURTEENTH AMENDMENT FABRICATION OF EVIDENCE)**
**(Against Defendants Lovell, Frome, Santos, Hertzler, Samora,**
**Quick, Jensen, and Lindsey, in their Individual capacities)**

Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

115.

Defendants' Lovell, Frome, Santos, Hertzler, Samora, Quick, Jensen, and Lindsey acting under color of law, knowingly violated Plaintiff's Fourteenth Amendment by deliberately fabricating evidence and/or relying upon such by intentionally disregarding exculpatory evidence, testimony and laboratory reports, concocting patently false allegations, and providing false and misleading evidence and testimony to the prosecuting attorney.

116.

Defendants Lovell, Frome, Santos, Hertzler, Samora, Quick, Jensen, and Lindsey under penalty of perjury deliberately fabricated evidence, by generating and submitting false police reports and other documents attesting to the existence of probable cause which were relied upon by the prosecuting attorney to both obtain an indictment and prosecute otherwise unwarranted claims which Defendants knew were patently false. Similarly, said fabricated evidence was knowingly relied upon by Defendants Jensen and Lindsey to sustain the allegations and charges of their 2024 Internal Affairs investigation that all but ensured Defendants' malicious intention

of precluding Plaintiff from seeking and obtaining any future employment with the PPB or other law enforcement agency.

117.

As a direct and proximate result of the foregoing wrongful Fabrication of Evidence in violation of the Fourteenth Amendment, Defendants Lovell, Frome, Santos, Hertzler, Samora, Quick, Jensen, and Lindsey**,** and each of them, have caused injuries to Plaintiff's health, strength and activity, along with residual economic and social harms and damages including but not limited to lost wages, lost benefits, loss of future earnings and benefits, medical expenses, mental anguish, distress, humiliation, anxiety, pain and suffering, loss to reputation, embarrassment, and fear, such that the injuries incurred on account of Defendants' conduct have caused and continue to cause Plaintiff great mental, physical and nervous pain and suffering, humiliation, shock, distress and anguish.

118.

As such actions were undertaken in conscious and reckless disregard of the risk of injury to Plaintiff and done without any objective reasonable basis, Defendants' conduct can only be construed as intending to cause Plaintiff injury and as such, were performed in a malicious, and/or oppressive manner entitling Plaintiff to recover punitive damages from Defendants in an amount to be calculated according to proof.

## FOURTH CAUSE OF ACTION

**(42 U.S.C. §1983 FIRST AMENDMENT RETALIATION)**
**(Against Defendants Lovell, Frome, Santos, Hertzler, and Samora, in their Individual capacities)**

Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein

119.

Defendants Lovell, Frome, Santos, Hertzler, and Samora acting under color of law, knowingly violated Plaintiff's right to exercise expressive speech and association as afforded her under the First Amendment to the United States Constitution when she organized and offered free community events and activities from her business establishment located in the downtown Portland neighborhood of Goose Hollow whose demographic included a sizeable population of low income and homeless inhabitants who contributed to high rates of property crimes and as such, were the demographic that comprised the majority of arrests effectuated by PPB in the City of Portland. Given Portland's low income and 'homeless' problem and PPB's ineffectiveness in addressing its residual ramifications, Chief Lovell and Deputy Chief Frome seized upon Plaintiff's arrest that related to yet another instance of lawlessness in the Goose Hollow neighborhood, as a means of communicating to the City of Portland that PPB was intent on taking action in addressing crime even if it meant going after one of its own PPB employees, particularly one who it knew held a social and commercial association with the Goose Hollow neighborhood. Chief Lovell and Deputy Chief Frome instructed their subordinates, Detective Sergeant Santos, and Detectives Hertzler, Samora and Baer to investigate and procure probable cause to support criminal charges that were then used to substantiate Plaintiff's ultimate separation and termination from the Bureau, as well as IA findings sustained by Defendants Jensen and Lindsey as an ultimate death knell to ensure that Plaintiff is universally precluded from City or other law enforcement employment.

120.


**WARREN & SUGARMAN**
838 SW First Avenue, Suite 200 | Portland, OR 97204 | (503) 228-6655

As expressive and associative speech, Plaintiff served and associated with the Goose Hollow community, including its sizeable low income and homeless population, by hosting community events through her convenience store, the Superette. On account thereof, when Plaintiff became publicly associated with a criminal event that took place in the neighborhood, Defendants Lovell and Frome sought to affirmatively distance PPB from Plaintiff and her PPB employment. As such, Lovell and Frome saw fit to ensure that Plaintiff's arrest would result in criminal charges in order to dispel any accusations that the Bureau continued, on account of a Bureau history of instances, to engage in a pattern and practice of covering up for its PPB members and employees. The First Amendment prohibits governmental officials from using the machinery of government to punish individuals, including criminal prosecution and or chill the reasonable exercise of protected First Amendment rights.

121.

As a direct and proximate result of the foregoing wrongful First Amendment retaliation, Defendants Lovell, Frome, Santos, Hertzler, and Samora and each of them, have caused injuries to Plaintiff's health, strength and activity, along with residual economic and social harms and damages, including but not limited to lost wages, lost benefits, loss of future earnings and benefits, medical expenses, mental anguish, distress, humiliation, anxiety, pain and suffering, loss to reputation, embarrassment, and fear, such that the injuries incurred on account of Defendants' conduct have caused and continue to cause Plaintiff great mental, physical and nervous pain and suffering, humiliation, shock, distress and anguish.

122.

As such actions were undertaken in conscious and reckless disregard of the risk of injury to Plaintiff and done without any objective reasonable basis, Defendants' conduct can only be

construed as intending to cause Plaintiff injury and as such, were performed in a malicious, and/or oppressive manner entitling Plaintiff to recover punitive damages from Defendants in an amount to be calculated according to proof.

## FIFTH CAUSE OF ACTION

**(42 U.S.C. §1983 FOURTEENTH AMENDMENT DEPRIVATION LIBERTY INTEREST PROCEDURAL DUE PROCESS**
**(Stigma-Plus and Denial of Name-Clearing Hearing)**
**(Against Defendants Lovell in his Individual Capacity and the City of Portland)**

Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

123.

At all times relevant, Defendant Chief Lovell was acting under color of state law and within the course and scope of his authority as Chief of Police for Defendant City of Portland.

124.

The Fourteenth Amendment to the United States Constitution protects Plaintiff's liberty interest in her good name, reputation, personal integrity, honesty, and professional standing against governmental action that publicly disseminates false and stigmatizing accusations in connection with an adverse employment action without providing constitutionally adequate procedural protections.

125.

Defendant Chief of Police Lovell, acting in both his individual and official capacity and under color of state law, publicly made, authorized, endorsed, and/or disseminated statements accusing Plaintiff of criminal wrongdoing, specifically the criminal offenses of Official Misconduct, Hindering Prosecution and Tampering with Evidence.


**WARREN & SUGARMAN**
838 SW First Avenue, Suite 200 | Portland, OR 97204 | (503) 228-6655

126.

These accusations were extraordinarily serious and inherently stigmatizing because they directly implicated Plaintiff's honesty, integrity, ethical uprightness, trustworthiness, and fitness to hold public employment and occupy a position of public confidence.

127.

Defendant Chief Lovell issued and disseminated these statements through media outlets across the City of Portland and beyond thereby placing the stigmatizing accusations into the public domain and subjecting Plaintiff to widespread reputational injury.

128.

Defendant Chief's statements were made in both his individual and official capacity as the City's Chief of Police and City's Final Policymaker and on account thereof, were attributable to the exercise of governmental authority, and were disseminated in connection with the criminal investigation and resulting employment action against Plaintiff.

129.

The accusations were false, materially misleading, and/or presented in a manner that falsely and unfairly attributed criminal culpability, dishonesty, and ethical misconduct to Plaintiff. Plaintiff disputed the accusations and maintained that she had committed no criminal wrongdoing.

130.

The public dissemination of the accusations was accompanied by, and directly connected to, the adverse employment action taken against Plaintiff, including her termination from municipal employment.

131.

Plaintiff's termination was imposed under circumstances in which the criminal accusations and the public statements of Defendant Chief Lovell were used, relied upon, endorsed, or otherwise formed a substantial basis for the City's adverse employment action against Plaintiff.

132.

The combination of Defendant Chief's public dissemination of the stigmatizing criminal accusations and Plaintiff's resulting termination constituted a governmental alteration of Plaintiff's employment status accompanied by the imposition of a substantial stigma upon Plaintiff's reputation, professional standing, and future employment prospects.

133.

Plaintiff was subsequently exonerated of the criminal accusations of Official Misconduct, Hindering Prosecution and Tampering with Evidence when said charges were formally dismissed on March 15, 2024 and March 20, 2024.

134.

Plaintiff's exoneration materially undermined the criminal characterization of Plaintiff's conduct that had been publicly advanced by Defendant Chief and formed the basis for the stigma imposed upon Plaintiff.

135.

Following Plaintiff's exoneration, Plaintiff was unafforded either by Defendant Chief Lovell or his successor, Chief Robert Day nor the Defendant City of Portland a meaningful post-

deprivation name-clearing hearing to afford Plaintiff an opportunity to refute the criminal accusations, present evidence concerning her exoneration, challenge the public characterization of her conduct, and formally defend her honesty, integrity, and professional reputation.

136.

Plaintiff was specifically precluded an opportunity to address the public accusations made by Defendant Chief in his official capacity and to establish, through a meaningful administrative proceeding, that the criminal accusations did not accurately reflect Plaintiff's conduct or professional integrity.

137.

Defendants thereby denied Plaintiff a meaningful opportunity to refute the stigmatizing accusations publicly attributed to her and to clear her name following the termination of her municipal employment.

138.

Defendants' refusal to provide a name-clearing hearing left the City's highest-ranking law enforcement official's public accusations unchallenged through any meaningful municipal process and left Plaintiff without an official forum in which to defend her honesty, integrity, and professional standing.

139.

Defendants' conduct deprived Plaintiff of her constitutionally protected liberty interest in her good name, reputation, and professional integrity, in conjunction with the adverse employment action and termination imposed upon her, without the procedural protections required by the Fourteenth Amendment.

140.

Defendant Chief personally participated in the constitutional deprivation by making, authorizing, endorsing, and/or disseminating the stigmatizing public accusations and, to the extent he possessed authority over the relevant process, participated in or caused the absence of providing Plaintiff with a name-clearing hearing.

141.

As a direct and proximate result of the foregoing violation of Fourteenth Amendment rights procedural due process, Defendants Lovell and City of Portland and each of them, have caused injuries to Plaintiff's health, strength and activity, along with residual economic and social harms and damages, including but not limited to lost wages, lost benefits, loss of future earnings and benefits, medical expenses, mental anguish, distress, humiliation, anxiety, pain and suffering, loss to reputation, embarrassment, and fear, such that the injuries incurred on account of Defendants' conduct have caused and continue to cause Plaintiff great mental, physical and nervous pain and suffering, humiliation, shock, distress and anguish.

142.

As such actions were undertaken in conscious and reckless disregard of the risk of injury to Plaintiff and done without any objective reasonable basis, Defendant Lovell's conduct can only be construed as intending to cause Plaintiff injury and as such, were performed in a malicious, and/or oppressive manner entitling Plaintiff to recover punitive damages from Defendants in an amount to be calculated according to proof.

## SIXTH CAUSE OF ACTION
## (42 U.S.C. §1983 FOURTEENTH AMENDMENT PROCEDURAL DUE PROCESS)

**(Against Defendants Lovell, Frome in their Individual capacities and City of Portland)**

Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

143.

That Defendants Lovell and Frome acting under color of law, knowingly violated Plaintiff's right to an adequate and sufficient quantum of due process prior to deprivation of her property right given her status as a classified civil servant employed by the City of Portland.

144.

Under the Fourteenth Amendment to the United States Constitution, the City was prohibited from depriving Plaintiff of this protected property interest without constitutionally adequate procedural due process. Given that the assurance of due process is imperative for manifesting fundamental fairness, the City of Portland had promulgated the minimum process due when classified civil servants are threatened with deprivation of their employment, to wit, Human Resources Administrative Rules 5.01.

145.

Furthermore, Defendants, acting under color of state law and pursuant to their respective authority over Plaintiff's employment, investigation, and discipline, deprived Plaintiff of this protected property interest through an investigative and employment decision-making process that was predetermined, conflicted, and fundamentally unfair.

146.

As the employment decision process was founded upon Plaintiff's criminal investigation and the charges derived therefrom, rather than referring or transferring the criminal investigation to an impartial, independent law-enforcement agency, Defendants retained control over the


**WARREN & SUGARMAN**
838 SW First Avenue, Suite 200 | Portland, OR 97204 | (503) 228-6655

investigation within the Portland Police Bureau. The Portland Police Bureau's own Directive 0333.00, Criminal Investigations of Police Bureau Employees and Other Law Enforcement Agency Sworn Employees, recognizes the importance of objective and professional investigations, expressly contemplates referral to outside law-enforcement agencies, and requires investigators to avoid actual or perceived bias and conflicts of interest.

147.

Concurrent with the criminal investigation, the Portland Police Bureau initiated and conducted an Internal Affairs investigation concerning the same underlying events and allegations as Plaintiff's criminal investigation. The Internal Affairs investigation was not conducted as an independent and impartial inquiry into the facts. Rather, it was influenced by, relied upon, and/or structured around the conclusions and predetermined narrative of the conflicted criminal investigation.

148.

The same institutional interests, command personnel, and/or individuals who had participated in, influenced, or had an interest in the criminal investigation also influenced, directed, supervised, or controlled the administrative investigation and resulting employment determination. Defendants knew or reasonably should have known that the overlapping interests and involvement of these individuals created an unacceptable risk that the administrative investigation and resulting employment decision would be predetermined rather than based upon an impartial assessment of the evidence.

149.


**WARREN & SUGARMAN**
838 SW First Avenue, Suite 200 | Portland, OR 97204 | (503) 228-6655

Despite these conflicts, Defendants failed to provide an appropriately independent administrative investigative process, including referral to the independent investigative and oversight mechanisms available under the Portland City Charter and applicable City regulations. The resulting administrative findings were not the product of an impartial and meaningful evaluation of the evidence, but instead reflected and perpetuated the predetermined conclusions reached through the conflicted investigative process.

150.

Defendants thereafter relied upon the resulting Internal Affairs findings and recommendations to initiate, recommend, approve, or impose Plaintiff's termination. In response, Plaintiff was entitled to constitutionally adequate procedures before an impartial decision-maker, including a meaningful opportunity to contest the factual allegations, investigative conclusions, and evidence upon which the proposed termination was based.

Defendants deprived Plaintiff of these protections by conducting and relying upon a predetermined and conflicted investigative process in which the material factual issues were effectively decided before Plaintiff was afforded a meaningful opportunity to respond.

151.

The purported opportunity to respond as otherwise guaranteed by the Fourteenth Amendment was not meaningful because the officials responsible for the employment decision had already adopted or committed themselves to the conclusions of the conflicted investigations and were not genuinely considering Plaintiff's response or contrary evidence.

The administrative process therefore failed to provide Plaintiff a meaningful opportunity to contest the allegations before an impartial decision-maker capable of independently evaluating


**WARREN & SUGARMAN**
838 SW First Avenue, Suite 200 | Portland, OR 97204 | (503) 228-6655

the evidence and reaching a decision uninfluenced by the predetermined investigative conclusions.

152.

Defendants Chief Lovell and Deputy Chief Frome personally participated in, directed, approved, or knowingly acquiesced in the investigative and employment decision-making process described above.

These Defendants knew of the actual and/or perceived conflicts affecting the investigations, knew or should have known that the resulting proceedings were predetermined or materially unfair, and nevertheless caused or permitted the investigative findings to be used as the basis for terminating Plaintiff.

153.

Defendant Lovell exercised final authority over the challenged employment decision and personally approved, adopted, or imposed Plaintiff's termination notwithstanding the procedural deficiencies described herein. On account thereof, the City of Portland is liable under 42 U.S.C. § 1983 because the constitutional deprivation was caused by a decision by Chief Lovell, the official possessing final policymaking authority concerning personnel matters.

154.

As a direct and proximate result of the foregoing violation of Fourteenth Amendment rights procedural due process, Defendants Lovell, Frome, and the City of Portland and each of them, have caused injuries to Plaintiff’s health, strength and activity, along with residual economic and social harms and damages, including but not limited to lost wages, lost benefits, loss of future earnings and benefits, medical expenses, mental anguish, distress, humiliation, anxiety, pain and suffering, loss to reputation, embarrassment, and fear, such that the injuries

incurred on account of Defendants' conduct have caused and continue to cause Plaintiff great mental, physical and nervous pain and suffering, humiliation, shock, distress and anguish.

155.

As such actions were undertaken in conscious and reckless disregard of the risk of injury to Plaintiff and done without any objective reasonable basis, Lovell and Frome's conduct can only be construed as intending to cause Plaintiff injury and as such, were performed in a malicious, and/or oppressive manner entitling Plaintiff to recover punitive damages from Lovell and Frome in an amount to be calculated according to proof.

**SEVENTH CAUSE OF ACTION**

**(SECTION 1983 FAILURE TO INTERCEDE)**

**(Against** Lovell, Frome, Quick, **Santos, Hertzler, Samora, Jensen, Lindsey in their Individual capacities)**

Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

156.

Law enforcement officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen. If an officer fails to intercede, 'the constitutional right violated by the passive officer is the same as the right violated by the person

who' performed the offending action. Law enforcement's failure to intercede is actionable under Section 1983.

157.

Defendants Hertzler, Santos and Samora, each individually and collectively, were assigned to conducting and undertaking the investigation of Plaintiff's conduct relating to the incident that occurred at the Superette in the Goose Hollow neighborhood on or about April 5, 2021 and in its aftermath. In compiling the fruits of their individual investigations with the aim of forwarding the results to the District Attorney's office, Hertzler, Santos and Samora each had the opportunity to construe what the other Detectives had determined and/or failed to disclose such that each of them had the opportunity to intercede in order to cease the impending constitutional violations that were being perpetuated. Such opportunity would have been in early 2023 given that Plaintiff's indictment was handed down in March 2023.

158.

As such, each were well apprised of their own and each others fabrication of evidence, withholding of exculpatory evidence, and conjuring and perpetuating false narratives with respect to Plaintiff's presence at the Central Precinct on or about April 5, 2021, as well as the absence of the exonerating laboratory results that had been withheld from the District Attorney's file. Thus, Hertzler, Santos and Samora had ample opportunities to intercede and cease their own and their colleague's violation of Plaintiff's constitutional rights under the First, Fourth and Fourteenth Amendments.

159.

Defendants Lovell and Frome, each individually and collectively, were charged with both (1) supervising Defendants Hertzler, Santos and Samora with respect to ensuring the integrity of their investigation and findings, as well as (2) holding decision-making oversight with respect to effectuation of Plaintiff's arrest. In having been on notice that Defendants Hertzler, Santos and Samora's investigation and determination of probable cause was founded upon fabrication of evidence, withholding of exculpatory evidence, and the conjuring and perpetuation of false narratives with respect to Plaintiff's presence at the Central Precinct on or about April 5, 2021, Lovell and Frome each and collectively had the opportunity to cease their subordinate's violation of Plaintiff's constitutional rights under the First, Fourth and Fourteenth Amendments. Instead, Defendants Lovell and Frome refused and failed to intercede thereby exposing themselves to liability under Section 1983.

160.

Defendants Lovell and Frome had the additional opportunity to intercede and cease each other's violation of Plaintiff's rights under the First and Fourteenth Amendments when they convened and undertook employment termination proceedings against Plaintiff knowing that (1) their grounds for termination were both retaliatory and founded upon fabricated evidence and (2) the due process provided particularly in Lovell and Frome's failure to recognize and comply with Directive 0333.00, Criminal Investigations of Police Bureau Employees and Other Law Enforcement Agency Sworn Employees where Plaintiff's investigation was required to be conducted by an agency other than the PPB to inure against a partial and/or interested investigation.

161.

Similarly, Defendants Jensen and Lindsey, each individually and collectively, were assigned to conduct and undertake an Internal Affairs ("IA") investigation regarding Plaintiff's

conduct relating to the events of April 5, 2021 both at the Superette and at PPB Detective Division. As such, each were in possession with the fruits, i.e., documentation and files, of DetectivesHertzler, Santos and Samora's investigation, as well as privy to the evidence and findings of the Circuit Court and the Ethics Commission's findings. As such, Jensen and Lindsey were well apprised of Defendants Hertzler, Santos and Samora's fabrications of evidence, withholding of exculpatory evidence, and their conjuring and perpetuation of false narratives with respect to Plaintiff's presence at the Central Precinct on or about April 5, 2021. Apprised of such information that Plaintiff's constitutional rights under the First, Fourth and Fourteenth Amendments were being violated, both Jensen and Lindsey had ample opportunities to intercede and cease their IA investigation and withdraw their disciplinary charges against Plaintiff. Instead, Defendants Jensen and Lindsey refused and failed to intercede thereby exposing themselves to liability under Section 1983.

162.

Lastly, Defendant Lieutenant Quick had the opportunity to intercede and thwart Defendants Hertzler, Santos and Samora's intention of 'entrapping' Plaintiff by enabling the opportunity for her to violate both the Oregon Revised Statutes and PPB regulations. Upon learning that Defendants Hertzler, Santos and Samora had relied upon a fabricated motive to justify probable cause for the underlying charges of Official Misconduct and Hindering Prosecution, Defendant Lieutenant Quick was presented with the opportunity to intercede and offer what he knew to be Plaintiff's bona fide motive for visiting the Precinct, i.e., to determine and ensure that her husband's health was being taken care of.

163.


**WARREN & SUGARMAN**
838 SW First Avenue, Suite 200 | Portland, OR 97204 | (503) 228-6655

In being well apprised of Plaintiff's intention to proceed to the precinct to check on her husband's welfare while her husband was being detained and investigated for committing a crime, Defendant Quick had the opportunity to cease Defendants Hertzler, Santos and Samora's violation of Plaintiff's constitutional rights under the First, Fourth and Fourteenth Amendments. Instead, Defendant Quick refused and failed to intercede thereby exposing himself to liability under Section 1983.

164.

As a direct and proximate result of the foregoing violations of Plaintiffs First, Fourth and Fourteenth Amendment rights, Defendants Frome, Santos, Hertzler, Samora, Quick, Jensen, and Lindsey has caused injuries to Plaintiff's health, strength and activity, along with residual economic and social harms and damages, including but not limited to lost wages, lost benefits, loss of future earnings and benefits, medical expenses, mental anguish, distress, humiliation, anxiety, pain and suffering, loss to reputation, embarrassment, and fear, such that the injuries incurred on account of Defendants' conduct have caused and continue to cause Plaintiff great mental, physical and nervous pain and suffering, humiliation, shock, distress and anguish.

165.

As such actions were undertaken in conscious and reckless disregard of the risk of injury to Plaintiff and done without any objective reasonable basis, Defendants' conduct can only be construed as intending to cause Plaintiff injury and as such, were performed in a malicious, and/or oppressive manner entitling Plaintiff to recover punitive damages from Defendants in an amount to be calculated according to proof.

**EIGHTH CAUSE OF ACTION**

**(SECTION 1983 MUNICIPAL LIABILITY)**
**(Against the City of Portland)**

Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

166.

A choice and/or ratification made by a municipal officer with final policy-making authority can expose a municipality to liability under 42 U.S.C. 1983. As final policy making authority is determined under the laws and regulations of the municipality in question, under both Oregon law and the City Code of Portland, the Chief of Police is the final policymaker over, among other duties and functions, “arrests for breach of peace or the commission of crime within the limits of the City [of Portland]…” Portland City Code section 3.20.040.

167.

With respect to ratification, a municipality can "be liable for an isolated constitutional violation if the final policymaker ratifies a subordinate's actions.”

168.

During the operative time of April 5, 2021 and October 10, 2023, Defendant Lovell, was the PPB Chief of Police. Succeeding Chief Lovell, Chief Robert Day assumed the position during the operative time of October 11, 2023 and July 31, 2024.

169.

As such, in holding chief policymaking authority with respect to “arrests for the commission of crimes within the limits of the City of Portland,” upon information and belief,

Chief Lovell made the final decision and/or ratified his subordinates, Defendant Detectives Santos, Samora, and Hertzler's decision to affirm the existence of probable cause despite having first hand knowledge that the facts supporting such were reliant upon fabricated evidence, i.e., exculpatory laboratory results with respect to the tampering of evidence charge and fabricated accounts of Plaintiff's conduct at the precinct on April 5, 2021 with respect to the Official Misconduct and Hindering Prosecution charges.

170.

Such conduct was in patent violation of Plaintiff's Fourth and Fourteenth Amendment rights. Thus, Defendant Chief Lovell, as the City's chief law enforcement policymaker made a deliberate choice to endorse his subordinates unconstitutional conduct and as such, liability for its Final Policymaker's decision-making attached to the City of Portland under Section 1983.

171.

Municipal liability also attaches on account of Chief Lovell and Day's final policymaking authority with respect to PPB personnel decisions wherein Chief Day decided and/or ratified Plaintiff's non-disciplinary termination with knowledge that such deprivation of Plaintiff's property right was both premature given its non-disciplinary grounds[8] and with respect to municipal liability, procured in violation of Plaintiff's Fourth Amendment rights to be free from

[8] The basis upon which Chief Lovell decided and/or ratified Plaintiff's termination was on account that Plaintiff, in facing a criminal prosecution, was unable to possess her CJIS security clearance and as such, could not perform her administrative duties during the pendency of her prosecution. Such restriction however would have been lifted were Plaintiff to prevail over her criminal charges and as such, the reliance upon this restriction to terminate was palpably premature and unwarranted particularly given Plaintiff's otherwise flawless personnel record over her twenty-eight-year tenure with the PPB. As such, a reasonable inference exists that Chief Lovell terminated Plaintiff's employment upon considerations other than permissible ones and given the circumstances, inferentially in violation of her First Amendment and Fourteenth Amendment rights.

a malicious prosecution, First Amendment right to be free from retaliation and Fourteenth Amendment procedural due process rights. Thus, Chief Day made a deliberate choice out of alternative options, i.e., await the disposition of Plaintiff's criminal prosecution, when he terminated Plaintiff's employment as otherwise motivated by constitutionally infirm grounds.

172.

Similarly, under that same final policymaking authority with respect to PPB personnel decisions, Chief Day's ratification of Defendant Captain Chris Lindsey and Commander Jacob Jensen's decision to sustain disciplinary charges against Plaintiff in their Internal Affairs investigation also rendered the City municipally liable.

173.

By sustaining Plaintiff's disciplinary charges upon Defendants Lindsey and Jensen's knowing reliance upon fabricated evidence, deficient due process, and with retaliatory animus that were in patent violation of Plaintiffs First and Fourteenth Amendment rights, Chief Day ratified such knowing that the sustained findings rendered by Defendants Lindsey and Jensen would have the intended result of permanently barring Plaintiff from future PPB employment.

174.

As a direct and proximate result of the foregoing violations of Plaintiffs First and Fourteenth Amendment rights, Defendant City of Portland has caused injuries to Plaintiff's health, strength and activity, along with residual economic and social harms and damages, including but not limited to lost wages, lost benefits, loss of future earnings and benefits, medical expenses, mental anguish, distress, humiliation, anxiety, pain and suffering, loss to reputation, embarrassment, and fear, such that the injuries incurred on account of Defendants' conduct have

caused and continue to cause Plaintiff great mental, physical and nervous pain and suffering, humiliation, shock, distress and anguish.

**WHEREFORE,** Plaintiff prays this honorable Court to grant judgement in her favor against the Defendant, its agents, employees and duly authorized representatives as follows:

1. For economic damages in a sum of $3,502,676.24;
2. For noneconomic damages in a sum according to proof;
3. For punitive damages in a sum according to proof;
4. For declaratory relief ordering Defendant City of Portland to: (1) refrain from undertaking criminal investigations pertaining to PPB employees but rather to transfer such investigations to conflict free sister law enforcement agencies; (2) refrain from taking adverse employment actions upon classified City employees who face criminal arrest and/or prosecution in order to comport with both federal and state public policy; and (3) that proper oversight, supervision and training are in place to ensure that PPB law enforcement are respecting the constitutional rights of arrestees such that criminal investigations are undertaken in an unbiased and objective manner free from malice, evidence fabrication, and perjury;
5. The return of Plaintiff's seized property, including electronics, computers, phone, documents, personal effects, etc., confiscated as a result of Defendants' search warrant conducted at Plaintiff's home and place of business on or about March 17, 2023.
6. For reasonable attorneys' fees pursuant to 42 U.S.C. § 1988;
7. For cost of the suit herein and
8. For such other and further relief as the Court deems just and proper.


**WARREN & SUGARMAN**
838 SW First Avenue, Suite 200 | Portland, OR 97204 | (503) 228-6655

DATED: November 22nd, 2026

Respectfully submitted,

/s/ Ernest Warren

**Ernest Warren** (OSB 891384)
WARREN & SUGARMAN
838 SW First Avenue, Suite 200

Portland, OR 97204
Telephone: (503) 228-6655
e.warren@ernestwarrenlaw.com

Louren Oliveros (OSB No. 155386)

OLIVEROS LAW, PLLC
50 Charles Lindbergh Blvd. Ste. 205
Uniondale, NY 1553
Telephone: (516) 310-4954
Email: oliveros@trialwarrior.net

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing PLAINTIFF KAREN CHIRRE'S FOURTH AMENDED COMPLAINT on the following person(s) on [DATE OF SERVICE], in the manner(s) indicated below:

**Lucy G. Ohlsen**
Portland Office of City Attorney
1221 SW 4th Avenue, Suite 430
Portland, OR 97204
Telephone: (503) 823-3057
Email: lucy.ohlsen@portlandoregon.gov
Attorney for Defendants

**Trung D. Tu (OSB No. 004100)**
Portland Office of City Attorney
1221 SW 4th Avenue, Suite 430
Portland, OR 97204
Telephone: (503) 823-3057
Email: trung.tu@portlandoregon.gov
Attorney for Defendants

METHOD OF SERVICE

☑ Electronic mail

☐ Hand delivery

☐ Regular mail, postage prepaid

☑ E-service via CM/ECF

☐ Other: [METHOD]

DATED this 22nd day of November, 2026.

**WARREN & SUGARMAN**
/s/ Ernest Warren, Jr.
Ernest Warren, Jr., OSB No. 891384
Attorney for Plaintiff
e.warren@ernestwarrenlaw.com